IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, CHIEF JUDGE

Civil Action No. 05-cv-01185-LTB-OES

SUSAN GRACE SCHNEIDER,
RICHARD HARRY SCHNEIDER, and,
ROBERT ANDRIES SCHNEIDER, As Trustees of the Revocable Trust of Janet S. Schneider
dated October 26, 1987, as amended,

       Plaintiffs,
and

SUSAN GRACE SCHNEIDER
RICHARD HARRY SCHNEIDER, and
ROBERT ANDRIES SCHNEIDER, in their capacities as Beneficiaries of the Revocable Trust of
Janet S. Schneider dated October 26, 1987, as amended.

       Additional Plaintiffs,
v.

HENRY H. CATE, JR. a/k/a
TONY CATE,

       Defendant.

_____

**Memorandum Opinion and Order**
_____

Babcock, C.J.

      The children of Janet Schneider Cate, acting as Trustees of the Revocable Trust of Janet

S. Cate of 1987, As Amended,  bring this suit against Janet's husband, Henry Cate, seeking

declaratory judgment regarding ownership and rights to various pieces of personal and real

property. The same individuals, acting in their capacity as Trust Beneficiaries, bring state tort

claims against Henry Cate for unlawful interference with Janet Cate's intentions for her estate.

Henry Cate moves to dismiss all claims for lack of subject matter jurisdiction and personal

jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and (2), or in the alternative, to transfer venue to Wyoming.  This motion has been thoroughly briefed and a Hearing was held December 6, 2005. For the reasons set forth below, defendant's Motion to dismiss is GRANTED as to lack of personal jurisdiction. Because I dismiss for lack of personal jurisdiction, I do not address defendant's arguments regarding lack of subject matter jurisdiction or transfer of venue.

## I.  BACKGROUND

This case concerns a dispute over the estate of Janet Schneider Cate ("Janet") between her children, acting as the Trustees and Beneficiaries of Janet's Trust (collectively "plaintiffs"), and her late husband, Henry Cate ("Cate"), the defendant. The Trustees seek declaratory judgment to determine the rights of the parties to various assets in dispute and to clarify various debts and obligations. The Beneficiaries make tort claims against Cate for improperly influencing Janet and seek equitable reform of the disposition of some of the assets.

Janet was the mother of the plaintiffs and the wife of the defendant. Janet formed the Trust in 1987, naming herself as Grantor and Trustee, her then-husband Richard Schneider as Successor Trustee and her children Susan, Richard and Robert as Alternate Co-Trustees (collectively "Trustees"). Under the Trust, if Richard Schneider were to predecease Janet, the Trust assets were to pass to the children in equal shares.  After establishing the Trust, Janet placed unknown but apparently substantial amounts of personal and real property into the Trust.

Janet's then-husband, Richard Schneider, the plaintiffs' father, died in 1991.  On June 6, 1994, Janet amended the Trust so that upon Janet's death the Trust assets would be divided equally among the three children. As Trustees, each of the three children signed this Amendment ("First Amendment.")

2

Janet began her relationship with Cate sometime around 1996 and married him on August 1, 1998, in Colorado. After they were married, Janet and Cate lived mainly in their home in Casper, Wyoming. They also spent time at homes owned by Janet in Indian Wells, CA, Montrose, CO and at the Echo Mountain Ranch outside of Casper, Wyoming.

Janet's financial relationships with and connections to Cate were multiple, and complex. Before marrying Cate, Janet transferred approximately $1.7 million from the Trust to settle Cate's divorce from his former wife and transferred an unknown amount of Trust funds to pay off Cate's debts. On July 7, 1998  Janet and Cate entered into a pre-marriage agreement stating that all of their separate property would remain separate property during their marriage. Also on July 7, 1998 Janet's lawyers informed Cate that she was providing an allowance to him of $200,000 a year in consideration of his inability to continue in any "gainful enterprise" after his marriage to Janet.

On August 4, 1998 Janet executed a Qualified Terminal Interest Property Trust Agreement ("QTIP Trust") in favor of Cate. The QTIP Trust was not funded, but provided that in the event of Janet's death the Trust would deliver to the QTIP Trust securities having a face value of $5,000,000. On the same day, Janet executed a Second Amendment to the Trust ("Second Amendment") stating that the Trust would transfer Trust assets worth $5,000,000 into the QTIP Trust within 60 days of Janet's death.  The co-Trustees did not sign this Second Amendment. Also on August 4, 1998 Janet, as Trustee of the Trust, quit-claimed a residence at 5500 S. Poplar in Casper, Wyoming to herself and Cate as husband and wife. In or around September of 1999, Janet further transferred to Cate securities with a face value of about $5,800,000. The QTIP Trust was signed and notarized in Colorado, but states in Section IX(7) that the laws of Wyoming

govern its "validity and construction."

Janet and Cate jointly own the Echo Mountain Ranch L.L.C. ("EMR LLC"), incorporated in Colorado in 1999. The EMR LLC's sole asset is the Echo Mountain Ranch ("EMR") a property located in Wyoming used by Janet and Cate, apparently for recreational purposes. It is unclear to what extent this ranch is an operating ranch or a show ranch. In May of 2002, the EMR LLC was administratively dissolved. The Trustees allege that after the dissolution the ranch was owned jointly by the Trust and the Revocable Trust of Henry Cate ("Cate Trust,") each owning a 50% share. The Trust and the Cate Trust attempted to establish ownership in the EMR LLC as joint tenants with rights of survivorship. The Trustees' second claim challenges the validity of this joint tenancy and requests a determination that the joint ownership is as tenants in common and, thus, without rights of survivorship.

On August 20, 2003, Janet incorporated J.R.R.S., ("JRRS"), a Wyoming corporation. On August 29, 2003 Janet formed the Poplar Vintage Limited Partnership ("Poplar Vintage"), a Colorado Limited Partnership, and transferred Trust Property to it. JRRS became Poplar Vintage's general partner and owns 1% interest in the partnership. The Trust became Poplar Vintage's sole Limited Partner and owns a 99% interest in it. According to its partnership agreement, Poplar Vintage is to be governed by Colorado law. As of December 31, 2004, Poplar Vintage owned securities with a value of $15,930,304.17.

On January 29, 2004 Janet executed a third amendment to the Trust ("Third Amendment.")  This provided, among other things, that in the event Janet predeceased Cate and if they were both residing at the Casper, Wyoming residence at the time of her death, Cate would receive from the Trust the personal property "indigenous to the occupancy and maintenance of

4

said residence." Also, the residue of the Trust would be equally divided among the three children and Cate. The children, as co-trustees, were not given an opportunity to sign the amendment and did not sign it.

On October 20, 2004, after she was diagnosed with cancer in March of 2004, Janet executed a fourth amendment to the Trust ("Fourth Amendment.")  This Amendment stated, among other things, that the co-trustees would assume the duties of Trustee prior to Janet's death if two physicians certified that Janet had become incapacitated. In February of 2005, two physicians made these certifications. On March 25, 2005 Susan Schneider, Janet's daughter, acting under power of attorney for Janet, sold the personal property in Janet's homes in Wyoming and California to the Trust for one dollar.  On May 6, 2005, Janet died.

The backdrop to this case is a dispute over a probate proceeding in Wyoming. Janet's children believed that the creation of the Trust and the placing of Janet's assets in the Trust obviated the need for a probate proceeding. They were thus surprised when they were contacted shortly after Janet's death by Charles Chapin, ("Chapin"), the named executor of Janet's will, requesting a copy of the will for probate in Wyoming.  One of the Trustees, Richard Schneider, informed Chapin that probate was unnecessary since all of Janet's assets were in the Trust.

Chapin continued to press the Trustees to produce the will. On or about June 23, 2005 (the letter is dated June 23, 2005 on page 1 and June 27, 2005 on page 2), Chapin sent a letter to Richard Schneider demanding delivery of the will by July 8, 2005. Prior to that deadline, Chapin filed a notice with the probate court to compel production of the will on July 7, 2005.  The Trustees provided the will on July 22, 2005.

The plaintiffs in this action have challenged the Wyoming probate proceeding, arguing that the Wyoming court should not probate the will because all assets requiring probate in Wyoming were transferred to the Trust. The Trustees have also challenged the behavior and conduct of Chapin as Personal Representative. The Trustees filed their complaint in federal court on June 24, 2005. Chapin petitioned the Wyoming court for Probate of the will and Appointment as Personal Representative on July 22, 2005.  The Wyoming court admitted the will to probate August 1, 2005.  The Trustees petitioned the Wyoming court to vacate the order admitting the will to probate on August 5, 2005.

Of particular relevance to this case is a provision in the second codicil to the will, signed in Wyoming September 15, 1999, which states that the personal property in the residence at Casper, Wyoming will go to Cate, with any unpaid marital tax to be paid by the Trust. This provision appears consistent with the Third Amendment of January 2004, but inconsistent with the sale of personal property to the Trust executed by Susan Schneider in March of 2005.

The Trustees, as plaintiffs, ask this Court to issue a declaratory judgment on their rights to and the disposition of several disputed pieces of property and components of Janet's estate. Specifically, they seek declaratory judgment of: 1) their rights regarding the title to personal property at the Echo Mountain Ranch, Janet's home in Indian Wells, California, and the residence in Casper, Wyoming (Claim 1); 2) the ownership and winding down of the EMR (Claim 2); 3) the validity of the QTIP Trust (Claim 3); 4) fulfillment of the QTIP Trust (Claim 4); 5) apportionment of taxes and other obligations to personal property (Claim 5); and 6) apportionment of taxes and expenses to marital share (Claim 6).  The Trustees assert Claim 2 as an interpleader claim, pursuant to 28 U.S.C. § 1335.

The Beneficiaries, as additional plaintiffs, make tort claims against Cate for subverting Janet's freedom of will (Claim 1) and interfering with their expectancy interest in receiving Trust assets (Claim 2). They also seek equitable reformation of the Cate Trust to make it co-extensive with the Second Amendment and the QTIP Trust (Claim 3) and to place any assets Cate currently holds from the Trust in a constructive trust to be restored to the Beneficiaries (Claim 4). Cate moves to dismiss all of these claims for lack of personal jurisdiction and lack of subject matter jurisdiction, and in the alternative moves for a change of venue. Because it is dispositive, I address only Cate's motion to dismiss for lack of personal jurisdiction.

## II.   PERSONAL JURISDICTION

Cate moves to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2). In a diversity action, a court only has personal jurisdiction over a defendant if jurisdiction is consistent with the state's long-arm statute and if jurisdiction does not offend the due process clause of the 14th amendment. *Benton v. Cameco Corp.,* 375 F.3d 1070, 1075 (10th Cir. 2004). The Colorado long arm statute allows jurisdiction to the full extent of the Constitution, so the jurisdictional analysis reduces to a single inquiry whether jurisdiction offends due process. *Id.*

Jurisdiction is appropriate only where a defendant has sufficient minimum contacts with the forum state. *Id.* Minimum contacts can be satisfied either through the doctrines of specific or general jurisdiction. Specific jurisdiction is appropriate where the defendant has purposefully directed his activities at the forum state and where the cause of action stems from the defendant's forum state contacts. *Id.* General jurisdiction arises where the defendant's forum state contacts are so systematic and continuous as to justify jurisdiction even where those contacts are not

directly related to the cause of action. *Id.* at 1081.  The Trustees and the Beneficiaries argue that

Cate is subject to both specific and general jurisdiction in Colorado, and that personal jurisdiction

is appropriate under the interpleader statute, 28 U.S.C. § 1335. As discussed below, I find and

conclude that this court lacks personal jurisdiction over Cate because he lacks the minimum

contacts to satisfy general or specific jurisdiction, and because Trustees' Claim 2 is not  a valid

interpleader claim.

A.      General Jurisdiction

        A state may exercise general jurisdiction over a defendant even when the alleged injuries

caused by the defendant are not related to the defendant's forum state contacts if these contacts

are "continuous and systematic enough that the defendant could reasonably anticipate being haled

into court in that forum." *Trierweiler v. Croxton and Trench Holding Corp.,* 90 F.3d 1523, 1543

(10th Cir. 1996).

        The threshold of contacts necessary to support general jurisdiction is high. *Id.*  For

example, general jurisdiction in Colorado was invalid for a defendant whose contacts consisted of

owning a joint bank account with his mother, belonging to the Tenth Circuit Bar, having

previously lived in Colorado for four years but prior to the events at issue, having owned property

in Colorado, being a limited partner in a Colorado partnership prior to the events at issue, being a

member of an advisory board of a Colorado corporation and often visiting Colorado and doing

small amounts of business in Colorado. *Id.* at 1544.

        The plaintiffs allege that Cate has the following contacts with Colorado for the purposes

of asserting general jurisdiction: 1) Cate was married in Colorado; 2) he frequently visits a home

in Colorado which the plaintiffs assert that Cate has called his "second home;" 3) Cate arranged

8

for substantial improvements in the Colorado home; 4) Cate "negotiated the purchase" of two vehicles for his own use; 5) Cate acquired a charge card for the City Market supermarket near to the Colorado home; 6) Cate kept numerous articles of personal property at the Colorado home; 7) before his retirement Cate "did extensive business" in Colorado as part of his work as a geologist in the oil and gas business; 8) in 1986 Cate executed a commercial loan agreement with a Denver bank for $170,000; 9) Cate regularly phones friends in Colorado; 10) The Cate Trust owns one half of the Echo Mountain Ranch, a Colorado LLC; 11) Cate stands to acquire a one fourth interest in Poplar Vintage, a Colorado LP, because of his status as a beneficiary of the Trust; and 12) the Trust is administered in Colorado and its assets include a Colorado LLC and a Colorado LP, and Cate would receive one fourth of the remaining assets in the Trust.

These contacts, presumed to be true, are not the kinds of "continuous and systematic activities" sufficient to justify general jurisdiction. A careful analysis of these contacts shows that they are less substantial than the contacts in *Trierweiler* that were insufficient to ground general jurisdiction.

Cate was married in Colorado, but spends most of his time in Wyoming. The plaintiffs provide no authority for the notion that the locale of marriage is relevant to a jurisdictional analysis. The Trustees rely heavily on Cate's presence in and activities surrounding Janet's Montrose, CO  home as a basis for general jurisdiction. They claim that Cate considered this home to be his "second home" and that Janet and Cate contemplated retiring there. However, "only the well pled facts of plaintiff's complaint, as distinguished from mere conclusory allegations, will be accepted as true."  *Wenz v. Memery Crystal,* 55 F.3d 1503, 1505 (10th Cir. 1995). Despite their claims about Cate's future intentions and their vague characterization of the

home as a "second home,"  Trustees' only specific factual allegation about the Montrose home is that Cate's visits to Colorado  "averaged two per year, with some lasting a few days and others lasting as long as three months." The Beneficiaries state that these visits may have ceased as of 2003. These contacts are less than those of the defendant in *Trierweiler*, who had lived in Colorado for four years, even though this was several years prior to the initiation of the litigation.

The cars that Janet and Cate kept at the Montrose home also do little to support general jurisdiction. The GMC suburban belonged to Janet before her marriage to Cate, and the two automobiles purchased after their marriage were purchased by the Trust. The Trustees do not claim that Cate owned these cars; only that Cate used the cars and "negotiated" their purchase. Similarly, the improvements to the Montrose home were paid for by the Trust; the documents the Trustees provide show only that Cate was involved in the transaction. The plaintiffs also assert that Cate kept some items of personal property at the Montrose home and that he had a charge card at the local supermarket (both of which Cate disputes.) These contacts suggest only that Cate visited his wife's Montrose home, helped with its upkeep and occasionally purchased groceries there. These contacts are fewer than those found in *Treierweiler* to be insufficient for general jurisdiction.

The Trustees allege that Cate's business activity in Colorado is at least equivalent to the ownership of a single gas station, which the Colorado Supreme Court found to be sufficient to confer general jurisdiction. *Archangel Diamond Corp. v. Lukoil,* No. 04SC455, 2005 WL 3097588, at *14 (Colo. Nov. 21, 2005).  In *Archangel,* the Court found that the defendant's ownership of the gas station, the defendant's Logo displayed on the gas station and the defendant's website  press release boasting of its commercial presence in Colorado, taken

10

cumulatively, raised "an inference that (the defendant) has a continued and systematic business presence here." *Id.*

The plaintiffs here have presented no evidence showing that Cate has a comparable "continued and systematic" commercial presence in Colorado. Cate owns no property in Colorado and has not conducted business in Colorado since, at the latest, 1998. Cate took out one commercial loan from a Colorado bank in 1986, nineteen years prior to this lawsuit. Cate is a co-owner of the Echo Mountain Ranch, LLC, but the ranch is located in Wyoming and the LLC was dissolved in 2002. This is not equivalent to the highly visible current ownership of a gas station that conferred general jurisdiction in *Archangel*. Cate's contacts are even less than those in *Treierweiler,* where general jurisdiction was lacking over a defendant who had conducted specific business in the state and was still doing so at the time of the lawsuit. *Trierweiler,* 90 F.3d at 1544.

The Beneficiaries argue that the Trust's contacts in Colorado are sufficient by themselves to justify general jurisdiction because Cate is a beneficiary of the Trust. This argument is unpersuasive for several reasons.

First, the Colorado contacts of the Trust are not necessarily attributed to Cate. Jurisdiction over the officers and directors of a corporation cannot be based on the contacts of the corporation, but must be based on the individual's ties to the forum state. *See Ten Mile Indus. Park v. Western Plains Service Corp.,* 810 F.2d 1518, 1527 (10th Cir. 1987). While corporate contacts can be attributed to the individual when the corporate entity is not viable, or when "the individuals are in fact conducting personal activities using the corporate form as a shield," *Id.,* no such evidence is presented here.

Second, even if the Trusts's ties can be attributed to Cate, they are insufficient to confer

jurisdiction. The Trust's links to Colorado include ownership of the EMR, a Colorado LLC that owns property in Wyoming; ownership of personal property at the Montrose home; the fact that the Trust is administered in Colorado; the Trust's ownership of Poplar Vintage and the fact that the Trust was originally signed and executed in Colorado. But these do not amount to sufficient Colorado links to justify general jurisdiction over Cate.  The EMR, as discussed above, is in Wyoming. Janet, as Grantor of the Trust, was a Wyoming resident. Of the three co-trustees/beneficiaries, only one lives in Colorado. While it is true the Trust was signed in Colorado in 1987, the Third Amendment, making Cate a beneficiary, was signed in Wyoming. The plaintiffs state that Cate will claim a share of Poplar Vintage, but the only fact they assert is that he has a one fourth share of the Trust assets, which presumably includes Poplar Vintage. In essence, their basis for jurisdiction related to the Trust amounts to Cate, a Wyoming resident, having a one-fourth claim to a Trust which owns certain assets that may be governed by Colorado law. This is insufficient to establish general jurisdiction.

I therefore find and conclude that this Court does not have general jurisdiction over Cate.

B.  Specific Jurisdiction

Specific jurisdiction involves a two part inquiry. *OMI Holdings, Inc. v. Royal Ins. Co. of Canada,* 149 F.3d 1086, 1091 (10th Cir. 1998). First, a defendant must have minimum contacts with the forum state. *Id.* This test requires analyzing two related but distinct questions: (1) whether the defendant purposefully directed his contacts at the forum state; and (2) "whether the plaintiff's claim arises out of or results from actions by the defendant himself that create a substantial connection to the forum state." *Id.* (Emphasis in original.) If a defendant is found to have sufficient minimum contacts to justify specific jurisdiction, it is still necessary to determine

whether the exercise of specific jurisdiction "offends traditional notions of fair play and substantial justice." *Id.* These two prongs operate on a sliding scale. The stronger the minimum contacts, the greater the burden on the defendant to show that jurisdiction is unreasonable. Conversely, a relatively weak showing of unreasonableness combined with insubstantial contacts may defeat jurisdiction. *Id.* at 1092. I will examine both of these prongs.

1.      Minimum Contacts

In this case, two sets of claims are relevant to the jurisdictional analysis. First, the Trustees allege that jurisdiction is justified because the disputed property and assets for which they seek declaratory judgment are closely linked to Colorado. Second, the Beneficiaries contend that Cate's tortious acts committed outside of Colorado had sufficient impact within Colorado to justify jurisdiction.

a.      Minimum Contacts for Trustees' Claims

The Trustees' argue that since the Trust owns Colorado assets and since Cate is expected to claim an interest in the Trust, and since disposition of the Trust is at issue in this case, this set of links establishes specific jurisdiction over Cate. This chain of logic fails for several reasons.

First, it is unclear whether the contacts between the Trust and Colorado are relevant to an inquiry into <u>Cate</u>'s contacts with Colorado. (See discussion of general jurisdiction, above.) Second, even if the Trust's contacts may be attributed to Cate, these contacts are not sufficiently linked to Colorado to confer jurisdiction, as discussed in the section in general jurisdiction above. The Trustees' first claim concerns personal property at homes in Casper, Wyoming, Indian Wells, California, and at the Echo Mountain Ranch, none of which are in Colorado. The second claim concerns winding up Echo Mountain Ranch, a Wyoming property. The Third and Fourth claims

13

relate to the QTIP Trust, a Wyoming Trust. The 5th claim concerns personal property at the

Casper home and the 6th claim concerns apportionment of taxes between Cate and the Trust, but

is not directly related to Colorado.  While the Trustees refer often to the Trust as the basis for

jurisdiction, the Trust's assets are not strongly linked to Colorado.

Third, specific jurisdiction must be based on "actions by the defendant himself that create a

substantial connection with the forum state." *OMI,* 149 F.3d at 1091. Here, there is no evidence

that Cate engaged in any affirmative act to reach into Colorado. The Trustees have alleged no

specific ties between Cate and Poplar Vintage, except to state that he is "expected to claim a one-

quarter share." Jurisdiction cannot be based on a defendant's mere expectancy. While Cate is

currently designated to receive one quarter of the Trust's assets, the evidence shows that it was

Janet as Grantor who designated Cate to be a beneficiary. The Trustees offer no evidence that

Cate himself acted to link himself to the Trust, and so fail to show the purposeful availment

necessary for specific jurisdiction.

> b.    Minimum Contacts for Beneficiaries' Claims

Cate argues that Beneficiaries' Claims 1 and 2 are not recognized torts in Wyoming or

Colorado and so cannot provide jurisdiction under the tortious act prong of Colorado's Long

Arm Statute. (Cate also contends, and the Beneficiaries do not seem to dispute, that Claims 3 and

4 are equitable remedies, and so do not provide an independent basis for personal jurisdiction.)

While the Colorado Supreme Court has not ruled directly on this issue, the Tenth Circuit

has interpreted Colorado law to recognize the claim of intentional interference with inheritance as

a common law tort. *Lindberg v. U.S.,* 164 F.3d 1312, 1319 (10th Cir. 1999), *see also Peffer v.*

*Bennett*, 523 F.2d 1323, 1325 (10th Cir. 1975).  Moreover, the Wyoming Supreme Court appears

to recognize intentional interference with expectancy of an inheritance as a tort. *See Spear v. Nicholson,* 882 P.2d 1237, 1240 (Wyo. 1994). Cate acknowledges that the Tenth Circuit has characterized undue influence over a will as a "species of fraud," *Peffer,* 523 F.2d at 1326. Whether or not fraud is a tort, it is the basis of jurisdiction under the Colorado long arm statute. *National Union Fire Ins. Co. of Pittsburgh, PA., v. Kozeny,* 115 F. Supp.2d 1231, 1236 (D. Colo. 2000). Accordingly, I conclude that Beneficiaries' claims 1 and 2 are legally cognizable for the purpose of asserting Colorado jurisdiction.

Cate argues next that his alleged acts in Wyoming did not create sufficient injury in Colorado to justify jurisdiction under a minimum contacts analysis. Colorado jurisdiction does not require a tortious act to be committed in Colorado so long as the act causes injury within Colorado. *Wenz,* 55 F.3d at 1507. However, "[n]ot all alleged 'injuries' that result from tortious contact in a foreign state will trigger long-arm jurisdiction." *Id.* at 1507-1508. "[W]hen both the tortious conduct and the injury occur in another state, the fact that plaintiff resides in Colorado and experiences some economic consequences here is insufficient to confer jurisdiction on a Colorado court." *Id.* at 1508.

In *Wenz* the plaintiff's suit concerned the disposition of funds in a bank account in London. The plaintiff transferred funds to London and claimed that the defendant illegally transferred these funds without the plaintiff's permission. The court found that since the money was in London and the tortious act was in London, the economic impact to a Colorado plaintiff was fortuitous and could not, absent additional Colorado ties, justify jurisdiction. *Id.* at 1508.

15

The facts here are analogous. The Beneficiaries argue that Cate overcame Janet's will to induce her to amend the Trust to Cate's benefit at their expense. Cate's actions would have a specific and predictable Colorado impact, since Cate knew that one Beneficiary lived in Colorado and knew the changes he induced would have a tortious impact in Colorado. However, Cate lived in Wyoming, committed these alleged acts in Wyoming and these acts affected a Wyoming Trust. Moreover, only one of the three Beneficiaries even lived in Colorado, rendering the Colorado impact of Cate's acts even more tenuous than those in *Wenz*. I therefore conclude that the injury in Colorado of Cate's conduct is insufficient to justify specific jurisdiction.

2.      Fair Play and Substantial Justice

Even though I have concluded that Cate lacks sufficient ties to Colorado to justify jurisdiction, I nevertheless analyze the second prong of this test, whether exercising Colorado jurisdiction is consistent with traditional notions of fair play and substantial justice. This test includes several elements: "(1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies." *OMI Holdings,* 149 F.3d at 1095.

a.      Burden on the Defendant

"While not dispositive, the burden on the defendant of litigating the case in a foreign forum is of primary concern in determining the reasonableness of personal jurisdiction." *Id.* at 1096. Here, the record shows that Cate has traveled frequently to Denver in the past, both by car and by plane. The record also shows that Cate has sufficient financial resources that the burden of

16

occasional travel to a neighboring state is not great. Cate states that his presence is necessary at his ranch, but litigating this case in Colorado will only require his occasional absence from Wyoming. Moreover, he has already hired a Denver law firm and he has a full time ranch caretaker. While some ranch tasks likely require two persons, there is no reason he cannot hire additional help for those times when he is absent from the ranch. Cate also attests to health issues that prevent him from driving to Colorado. Cate states that Colorado travel would therefore mean he would have to fly and pay the necessary costs. There is no doubt that litigating in Colorado would be inconvenient to Cate, but he has not shown that it would be a great burden. This factor slightly favors Colorado jurisdiction.

        b.      Forum State's Interest

"States have an important interest in providing a forum in which their residents can seek redress for injuries caused by out-of-state actors." *Id.* at 1096. Important to this analysis is whether the law of the forum state applies. *Id.* Here, this factor disfavors Colorado jurisdiction, since the law of Wyoming or other states will likely apply. In addition, only one of the three plaintiffs is a Colorado resident. It is also significant that the Trustees do not allege that Cate affirmatively reached into Colorado or availed himself of the laws of Colorado. Even for the Beneficiaries' tort claims, Cate is only alleged to have taken actions in Wyoming that have caused harm to one Beneficiary in Colorado. Thus, this factor weighs against Colorado jurisdiction.

        c.      The Plaintiff's Interest in Convenient and Effective Relief

This factor focuses on "whether the plaintiff may receive convenient and effective relief in another forum." *Id.* at 1097. It is particularly significant where a plaintiff's recovery is greatly burdened by having to litigate in another state or because of the other state's laws. *Id.* Here, as

stated above, Wyoming law will apply to a number of these claims, significant property at issue is in Wyoming, and only one of the plaintiffs lives in Colorado. While it may be somewhat easier for the out of state plaintiffs to appear in Colorado than in Wyoming, in either case they will have to travel. This factor also disfavors Colorado jurisdiction.

        d.      Interstate Judicial System's Interest in Efficient Resolution of Controversies

This factor addresses "whether the forum state is the most efficient place to litigate the dispute." *Id.* Considerations relevant to this issue include the location of witnesses, where the underlying wrong occurred, which state's substantive law applies and the need to avoid piece-meal litigation. *Id.* These all tend to support Wyoming jurisdiction. It is unclear at this stage of the litigation where the witnesses reside. But, as oral argument indicated, a substantial number of witnesses, including legal and medical witnesses, live near Casper, Wyoming. Wyoming law will likely predominate. The Trust fund at issue here does not "reside" anywhere, but it was made by a Wyoming resident and it holds assets in Wyoming and Colorado. The bulk of the property at issue is in Wyoming and the tortious acts that the Beneficiaries allege that Cate committed were in Wyoming. At this stage of the litigation, it is impossible to ascertain the effect of the Wyoming probate proceeding on this case. Cate argues that it is more efficient to consolidate this case in Wyoming so that the entire case will be conducted in one state. However, the case was filed in this court before the Wyoming action was initiated. Overall, this factor favors Wyoming jurisdiction.

        e.      Shared Interest of Several States in Furthering Fundamental Social Policies

This factor addresses whether the exercise of personal jurisdiction by Colorado affects the

18

substantive social policies interests of other states. *Id.* This factor does not appear relevant to this dispute.

In total, the analysis disfavors Colorado jurisdiction. This could be insufficient to defeat jurisdiction if Cate had strong ties to Colorado, but his contacts are insubstantial. I conclude that the exercise of specific jurisdiction would offend traditional notions of fair play and substantial justice.

C.    Interpleader Jurisdiction

Even in the absence of minimum contacts, the Trustees assert that personal jurisdiction in Colorado is proper under the interpleader statute, 28 U.S.C. § 1335. The Trustees' assert their second claim, Ownership and Winding up of Echo Mountain Ranch, as an interpleader claim. The Trustees argue that this statute independently confers nationwide service of process, which grants personal jurisdiction even over defendants who may lack personal contacts with the forum state. 28 U.S.C. § 2361. Effective service of process is sufficient to confer personal jurisdiction in an interpleader case. Fed. R. Civ. P. 4(k)(1)(C).

Interpleader actions enable a court to assert jurisdiction in order to adjudicate multiple claims by diverse parties to a common fund, to prevent the owner of the common fund from being forced to make separate inconsistent payments in separate actions. *See State Farm Fire & Cas. Co. v. Tashire,* 386 U.S. 523, 530 (1967). A court has jurisdiction to hear an interpleader claim when 1) the plaintiff has possession of $500 or more of property; 2) two or more adverse claimants of diverse citizenship claim rights to the property; and 3) the plaintiff has deposited the disputed money or property, or a bond equivalent to the value of the disputed property, into the Court registry. *Network Solutions, Inc., v. Clue Computing, Inc.,* 946 F.Supp. 858, 860 (D. Colo.

1996). In addition, a plaintiff must be the stakeholder, the owner of the property subject to competing claims. *General Atomic Co., v. Duke Power Co.,* 553 F.2d 53, 56 (10th Cir. 1977).  As I will discuss below, I conclude that this action is not a valid interpleader.

Cate contends this claim is an improper interpleader for several reasons. Cate argues that the Trustees are not a valid stakeholder because the Trust is at most a 50% owner of the EMR LLC, and as such is not responsible for paying out the EMR LLC's obligations. In the alternative, Cate asserts that this interpleader action lacks the necessary two adverse claimants.   If the Trustees are the stakeholder, then they are not claimants adverse to Cate. I find both of these arguments unpersuasive.

The Trustees are the proper stakeholder for the purpose of this action because the Trust will be the party obligated to pay out obligations on its 50% share of the EMR LLC. If the agreement establishing joint tenancy of the EMR LLC with rights of survivorship is valid, the Trust will lose its 50% ownership of the LLC. This conflicts directly with the potential claims of the Beneficiaries, who stand to lose their ownership share in this 50% interest. The Trust will be faced either with paying out its share of the EMR LLC to the Cate Trust or to the Beneficiaries.

Similarly, the Beneficiaries are valid adverse claimants for the purposes of an interpleader action, even though their complaint does not make specific claims on the EMR LLC. An adverse claim in an interpleader action does not need to be an actual litigated claim at the time the interpleader is brought. *United States v. Major Oil Corp.,* 583 F.2d 1152, 1158 (10th Cir. 1978). *See also State Farm,* 386 U.S. at 531-33. It is sufficient for an interpleader action that there are two or more adverse claimants "who may claim" to be entitled to a fund or property in dispute. *General Atomic,* 553 F.2d at 56.  As long as a plaintiff's anticipation of future liability is

reasonable and in good faith, it may be the basis for an interpleader. *Rubinbaum LLP v. Related Corporate Partners V, L.P.,* 154 F.Supp.2d 481, 486 (S.D.N.Y. 2001).

Here, the Beneficiaries are already parties to this case, have already asserted claims that implicate the Cate Trust – one of the competing claimants to the EMR – and clearly stand to lose if the EMR is transferred to the Cate Trust. I therefore conclude that the Beneficiaries are potential adverse claimants for the purposes of bringing this interpleader action. I reach this conclusion recognizing that the Trustees and the Beneficiaries in this case are in fact the same individuals, but also noting that the law recognizes them as separate entities in their distinct roles as Trustees and as Beneficiaries. This is undoubtedly an unusual application of the interpleader statute. However, the recent judicial trend has been "toward increasing the availability of interpleader and relaxing historical, technical restraints on the device." *NYLife Distributors, Inc., v. Adherence Group, Inc.,* 72 F.3d 371, 382 (3d Cir. 1995). In the last few decades, "statutory interpleader has been greatly broadened to include within its purview disputes concerning a wide range of obligations and competing claims." *Id.* Although close, with this broader and more flexible understanding of the role of interpleader in mind, I accept the Trustees as a valid stakeholder and the Beneficiaries as valid potential adverse claimants.

Cate also argues that this interpleader is invalid because the Trustees brought this claim for the improper motive of creating jurisdiction in Colorado. Cate contends that since he lacks minimum contacts with Colorado, an interpleader action was the plaintiffs' only basis to establish jurisdiction in this federal court. Cate argues that the plaintiffs controlled the timing of the probate action because they possessed the will. Cate alleges that the plaintiffs deliberately delayed delivery of the will in order to delay the probate action and file this federal action first.

21

It is true that the interpleader statute cannot be used for forum shopping. *Indianapolis Colts v. Mayor and City Council of Baltimore,* 733 F.2d 484, 486-487 (7th Cir. 1984). However, Cate presents only the barest of circumstantial evidence to support his claim of improper motives. It is just as plausible that Trustees genuinely believed that Janet's Trust arrangements rendered probate proceedings unnecessary, that they were surprised when Chapin contacted them about probating Janet's estate, and that they legitimately sought declaratory judgment in Colorado federal court to clarify their rights.

Although suspect, the Trustees' actions here do not compare to the far more blatant and egregious misconduct of the interpleader plaintiffs in the cases Cate cites. In *Indianapolis Colts,* the plaintiff, in order to obtain a more favorable forum, helped create the conflicting claims that became the basis for the interpleader, and then deliberately failed to invoke a contract clause that would have made the interpleader unnecessary. *Id.* at 487. In *Major Oil Company*, the plaintiff initiated the interpleader in order to seek protection from creditors. *Major Oil Company,* 583 F.2d at 1158.  In *Truck-a-Tune, Inc., v. Re,* 856 F.Supp. 77, 81 (D. Conn. 1993), the plaintiff used his own agent to initiate the adverse claim necessary to bring the interpleader action. Cate has not made a sufficient showing that the Trustees here have engaged in similar conduct and, thus, has failed to show that the Trustees bring this action with "unclean hands."

However, I find this interpleader action to be fatally flawed for a different reason. An interpleader action requires the plaintiff to deposit into the registry of the court the money or the property that is the "subject matter of the controversy." 28 U.S.C. § 1335 (a)(2). The plaintiff may also pay to the court the dollar amount of the property or asset in dispute, or provide a bond. *General Atomic Company,* 553 F.2d at 56. The statute makes clear that "the making of the

deposit or the giving of the bond is a condition precedent to the acquisition of jurisdiction."
*Gannon v. American Airlines, Inc.,* 251 F.2d 476, 481 (10th Cir. 1958.)  This condition has not
been satisfied here. So, stripped of this condition precedent, the Trustees' second claim is but a
naked declaratory claim of ownership and winding up of the EMR.

Although the liberal application of the interpleader statute accommodates a flexible
definition of a common fund, courts nevertheless insist on a bond, a cash deposit or some item of
tangible value to be deposited into the registry of the court. The property in dispute must be
"under the control of the person bringing the lawsuit, so as to be deliverable to the registry of the
court." *General Atomic Co.,* 553 F.2d at 57. Accordingly, an interpleader action was appropriate
when multiple parties disputed the ownership of rare paintings, and the paintings themselves were
deposited with the Court.  *John v. Sotheby's, Inc.,* 141 F.R.D. 29, 33 (S.D.N.Y. 1993). Similarly,
disputed rights to process natural gas were a valid interpleader common fund, but the court
ordered the plaintiff to provide a bond equal to the value of the disputed rights. *Oxy USA Inc. v.
Panhandle Eastern Pipe Line Co.,* 771 F. Supp. 337, 339 (D. Kan.1991). In an interpleader
action concerning conflicting claims over the assignments of rights to oil and gas leases, the
plaintiff placed the assignments themselves in the registry of the court. *Guy v. Citizens Fidelity
Bank & Trust Co.,* 429 F.2d 828, 829 (6th Cir. 1970).  Even an intangible asset such as an
internet domain name can be the subject of an interpleader action, but only where the plaintiff
controls the asset and can suspend its use during the pendency of the case. *Network Solutions,*
946 F.Supp. at 860.

Here, the Trustees have deposited with the registry of the court a February 2004
document purported to be a Certificate of Ownership in the EMR LLP. The document on its face

shows that it is not an instrument of ownership or conveyance either in the ranch itself, in the LLC

or in the Trust's 50% stake in the LLC.  Tendering this document does not prevent Cate from

using the ranch and does not prevent the Trustees from disposing of their 50% stake as they see

fit.  This document is merely a statement by Janet and Cate that they wish their ownership of the

LLP to be as Joint Tenants with rights of survivorship. As such, it is not a tangible or intangible

asset that can be made subject to distribution by this Court.

Moreover, as Trustees themselves argue, this document was executed almost two years

after the EMR LLC was administratively dissolved. A dissolved LLC continues to exist, but can

only conduct business "appropriate to wind up and liquidate its business and affairs."  C.R.S. §  7-

80-803(1) (2004). This document does not distribute LLC assets among its members, which is a

valid winding up function, C.R.S. § 7-80-803(1)(d) (2004), but merely states an intent to alter the

legal status of the ownership of the LLC itself, an action beyond the power of a dissolved LLC.

Thus, the Trustees offer the Court a document that is not the property in dispute, that conveys no

value, that does not prevent the parties from disposing of the property and that is likely legally

null and void. No bond or cash was deposited with the Court. Even under the modern liberal

trend, the Trustees have not satisfied 28 U.S.C. § 1335(a)(2). I therefore find and conclude that

the Trustees have not filed a valid statutory interpleader claim, and this Court therefore lacks

personal jurisdiction over Cate.

Since I find and conclude that this Court does not have personal jurisdiction over Cate, I do not address Cate's motions regarding subject matter jurisdiction or venue.

Therefore, it is so Ordered that:

1) Defendant's Motion to Dismiss for lack of Personal Jurisdiction (Docket # 14) is GRANTED; and

2) All claims against Defendant are DISMISSED; and

3) Judgment shall enter for the Defendant with costs.

DONE and ORDERED, this ___13th___ day of December, 2005 at Denver, Colorado.


    s/Lewis T. Babcock_____
United States District Chief Judge

25